**Edward L. JOLLY, Plaintiff,**

v.

**NORTHERN TELECOM, INC., Defendant.**

**Civ. A. No. 90–0322–A.**

United States District Court, E.D.Virginia, Alexandria Division.

June 24, 1991.

Anthony Herman, Jeffrey S. Harleston, Laura M. Steeves, Covington & Burling, Washington, D.C., for plaintiff.

Stewart S. Manela, Deborah L. Hirsch, Vienna, Va., for defendant.

## MEMORANDUM OPINION

CACHERIS, District Judge.

The plaintiff, Edward L. Jolly, alleging that the defendant, Northern Telecom, Inc. ("NTI"), discriminated against him on the

basis of race, instituted this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count I) and the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count II).[1]

Jolly contends that NTI discriminated against him when it denied him promotion to the position of Regional Support Manager and that it constructively discharged him through a continuing pattern of racial discrimination. Defendant NTI argues that Jolly was not promoted for legitimate, nondiscriminatory reasons and that he was not constructively discharged. For the reasons set forth below, Judgment is entered in favor of the plaintiff on his failure to promote claim and in favor of the defendant on the constructive discharge claim.

## I.

After reviewing the pleadings, evidence, authorities, and arguments of counsel, the court finds as follows:

Edward L. Jolly, a black male, graduated with honors from Morgan State University in 1972 and accepted employment shortly thereafter in the marketing department at Proctor & Gamble. He continued to work there until 1976, at which time he joined Johnson & Johnson, again working in the area of sales and marketing. (Testimony of Jolly, Tr. at 1:31). At Johnson & Johnson, he was eventually promoted to the position of corporate sales trainer, where he participated in the hiring and training of new employees, including new sales managers who were sent to manage departments outside the country. (Testimony of Jolly, Tr. at 1:32).

In 1980, he first entered the communications industry, joining AT & T as an account executive. There he undertook the responsibility of helping to develop the market share and profitability of that company's voice data networking products.

Three years later, he was promoted to the position of certified account executive and, as a result, began to oversee AT & T's national accounts. (Testimony of Jolly, Tr. at 1:33). While at AT & T, however, he never worked in a purely managerial position. (Testimony of Jolly, Tr. at 1:90).[2]

He then formed his own independent consulting firm in July 1983, providing evaluations and advice for various clients, including the Atlanta Hilton Hotel and Georgia Power. In May 1985, he finally began his relationship with NTI as a product specialist, grade 9, at Research Triangle Park in North Carolina.

In a Management Evaluation and Development ("MED") Review, dated October 1, 1985, Jolly was highly praised for his early work with the company. He had met or exceeded all of his work objectives, and his marketing expertise was considered a "valued addition" to the company. (Plaintiff's Exb. 10). In fact, on his evaluation, it was noted that he was "already doing the work of the next level of responsibility and seem[ed] to have potential for management in the future (beyond 36 months)."

After working at his Grade 9 position for approximately one year, he was promoted to Senior Product Specialist, grade 11. (Testimony of Jolly, Tr. at 1:33–34). This promotion came in approximately July 1986. (Testimony of Jolly, Tr. at 1:93). Shortly thereafter, Jolly received another very favorable MED review. On a form dated September 30, 1986, his evaluation once again stated that he had met or exceeded the company's expectations. (Plaintiff's Exb. 11). In fact, he was described as a "strong performer" who presented himself well and interacted favorably with customers.

When he first started at NTI, the plaintiff spent most of his time working with his main responsibility, the DMS–100. The

---

1. *See* Plaintiff's Amended Complaint for Declaratory[,] Injunctive and Monetary Relief, filed December 7, 1990. By Order of Judge Bryan, dated February 8, 1991, those parts of Count I of the Plaintiff's Amended Complaint that sought redress for discrimination based on failure to promote to the positions of Technical

Marketing Manager and MDC Marketing Manager were dismissed on statute of limitations grounds, and Count II was dismissed in its entirety.

2. The notation "1:90" refers to Volume 1 of the trial transcript at page 90.

DMS–100 is a product family that permits the central office of a telephone company to provide "a large array of voice featured data networking, local area networking, [and] a large collection of features and services to meet virtually most, if not all, of the needs of its customers." (Testimony of Jolly, Tr. at 1:37–38).

The DMS–10 is a competing product line that functions analogously to the DMS–100, except that it provides services to customers in rural, rather than urban metropolitan, areas. (Testimony of Astor, Tr. at 1:194–195). Although the two systems have certain similarities (both have switching systems that use Pascal computer language and both are microprocessor driven), the DMS–100 and the DMS–10 have different architectures. (Testimony of Jolly, Tr. at 1:38–39). Until recently, these systems were designed and manufactured by different NTI divisions. (Testimony of Astor, Tr. at 1:195).

Jolly's work with the DMS–10 was far less extensive than his work with the DMS–100, and the bulk of his labors with the former involved the giving of post-sales marketing assistance to telephone companies, such as NYNEX and New England Telephone. (Testimony of Jolly, Tr. at 1:38, 42). In fact, DMS–10 comprised only about two to three percent of the total sales volume in the Eastern Region and almost none of the marketing effort. (Testimony of John Wallis, Tr. at 2:183). Although the plaintiff only attended formal training sessions for Meridian Digital Centrex[3] ("MDC") and DMS–100, he endeavored to learn as much as he could about the DMS–10 by reading marketing bulletins and planning letters, and by attending seminars,

presentations, and workshops. (Testimony of Jolly, Tr. at 1:39–40, 134–135).

During his tenure at Research Triangle Park, the plaintiff had an opportunity to meet and work with Mark Astor, an NTI employee then working in the New York region. (Testimony of Astor, Tr. at 1:201–202). Astor had just been appointed to manage a marketing department in the company's Eastern Region office, located in McLean, Virginia. Jolly expressed some interest to Astor about helping to get activities in the new office under way and submitted a TAP form for a product specialist position.[4] (Testimony of Jolly, Tr. at 1:43–44).

On December 1, 1986, Jolly was subsequently awarded the job as a Grade 12 Senior Product Specialist in the Technical Marketing Department.[5] (Testimony of Jolly, Tr. at 1:45/Testimony of Astor, Tr. at 1:200). It had always been his understanding, however, that he assumed a managerial position in that department because that was the job opportunity that he and Astor exclusively discussed. (Testimony of Jolly, Tr. at 1:44). In fact, the job duties did involve management-style work: Jolly served as the acting manager of the department and took a lead role in organizing it and setting its agenda, overseeing its certification process,[6] and helping to train its less senior product specialists. (Testimony of Jolly, Tr. at 1:45/Testimony of Astor, Tr. at 1:152–153, 203).

In an organizational chart produced at that time by NTI for both itself and its clients, Jolly was listed as the acting Technical Marketing Manager. (Testimony of Jolly, Tr. at 1:49). In fact, in an NTI

---

**3.** Meridian Digital Centrex is another NTI product offered basically to business customers. It contains such services as direct inward dialing, direct outward dialing, intercom dialing, and transfer calling. (Testimony of Wallis, Tr. at 2:184).

**4.** At NTI, new positions are posted and applications are accepted on "Transfer and Advancement Program," or "TAP," forms.

**5.** Jolly, along with Steve Thomas, Beth Bowens, Abe Mathew, and Joyce Roberts was one of the first employees hired into the marketing depart-

ment in the Eastern Region. The latter three were also minorities: Bowens and Roberts were black, and Mathew was Asian/Indian. (Testimony of Astor, Tr. at 1:202).

**6.** Apparently, the Eastern Region could not function autonomously within the company until first "certified" to do so. (Testimony of Jolly, Tr. at 1:46). Certification made the Eastern Region more competitive because it obviated the time-consuming process of sending proposals back to Research Triangle Park for preliminary review. (Testimony of Astor, Tr. at 1:154).

document labelled, "1987 Affirmative Action Plan," dated June 1, 1987, Jolly was classified as a mid-level management employee. (Testimony of Astor, Tr. at 1:158–159/Plaintiff's Exb. 66). Moreover, Joyce Roberts, who worked as Mark Astor's senior secretary, believed that Jolly was the Technical Marketing Manager because Astor told her so verbally and because he had requested her to prepare an organizational chart listing Jolly in that position. (Testimony of Roberts, Tr. at 2:10–12).

Immediately after his promotion in the Technical Marketing Department, Jolly returned to Research Triangle Park for approximately three months of additional training. (Testimony of Jolly, Tr. at 1:97). He then returned to the Eastern Region where, in his capacity as a teacher and a supervisor, he helped coordinate the training of two product specialists in the McLean office, Dennis Mathews and Jean Brick. (Testimony of Astor, Tr. at 1:156). This involved constructing and implementing a training program for them at Research Triangle Park and assisting them in enhancing both their knowledge of DMS–100 and their ability to make effective product presentations to potential NTI clientele. (Testimony of Jolly, Tr. at 1:47–49). At the outset, Brick and Mathews reported directly to Jolly, who then made reports on their progress to Astor, although Astor soon retracted that responsibility from the plaintiff and arranged to have Brick and Mathews report directly to him. (Testimony of Jolly, Tr. at 1:99–100).

In June 1987, Astor called Jolly into his office and informed him that he would be posting an opening for the position of Technical Marketing Manager. The plaintiff then expressed a serious interest in the job and told Astor that he felt his past achievements at NTI qualified him for the position. (Testimony of Jolly, Tr. at 1:52, 55). To be sure, his knowledge of the product line could not be challenged: Vice–President for Sales and Marketing John Wallis[7] considered Jolly to be as knowledgeable as anyone he knew with respect to DMS–100

and Meridian Digital Centrex. (Testimony of Wallis, Tr. 2:199). In fact, Wallis placed Jolly on a special task force designed to win an important $32 million contract from the government. (Testimony of Wallis, Tr. at 2:201–202).

Nevertheless, Astor responded by telling him that he was instead seeking somebody with a stronger technical and engineering background—somebody who possessed skills that Jolly did not. (Testimony of Jolly, Tr. at 1:52, 55). He also told Jolly that he would be better suited for advancement if he moved into an area that would more easily enable him to take advantage of his marketing talents. (Testimony of Astor, Tr. at 1:209). Apparently, Astor was also looking for somebody who was better acquainted with the NTI staff at Research Triangle Park. (Testimony of Jolly, Tr. at 1:55).

The Technical Marketing Manager position was eventually awarded to John Donnelly, a person who had only been employed with NTI for seven months. (Testimony of Jolly, Tr. at 1:61/Testimony of Astor, Tr. at 1:168, 179). Interestingly enough, Donnelly had actually only applied for the position of Senior Product Specialist. (Testimony of Astor, Tr. at 1:171/Plaintiff's Exb. 41). It was Astor's decision to make him into a manager. (Testimony of Astor, Tr. at 1:171–172). Furthermore, Donnelly really had no specific DMS–100 experience at the time that he was interviewed: He never sold, marketed, or made a single presentation involving the DMS–100 product line. (Testimony of Astor, Tr. at 1:173). Later performance evaluations even indicated that he had a weakness in the area of product knowledge. (Testimony of Astor, Tr. at 1:173/Plaintiff's Exb. 47). In fact, it was merely his interest in being "educated" in the latest technologies that motivated him to seek employment in the Eastern Region. (Plaintiff's Exb. 41).

---

7. In February 1989, Wallis was subsequently relocated (at NTI expense) to Raleigh, North Carolina, where he assumed the position of Senior Manager, International Business Development. (Testimony of Wallis, Tr. at 2:182, 196).

Shortly after Jolly inquired about the Technical Marketing Manager position that Donnelly later received, he also asked Astor whether he might be considered for the managerial position in a new MDC marketing department that was going to be forming in the McLean office. (Testimony of Jolly, Tr. at 1:56). Astor then responded by telling him that he considered him too valuable to lose and by offering him, instead, the alternative of working in the market analysis area of the department in which he currently worked. (Testimony of Jolly, Tr. at 1:57).[8]

Jolly understood that his duties in the marketing analysis position would, in fact, be quasi-managerial. He would again be delegated the responsibility of getting an operation up and running, supervising a fellow employee (Steve Thomas), and developing and implementing a strategy that would increase NTI's profitability. (Testimony of Jolly, Tr. at 1:57–58, 110). Based on those representations, Jolly subsequently assumed the foregoing responsibilities, although Astor called him into his office at some point later on and told him not to supervise Steve Thomas any longer. When Jolly asked why, he was told that Thomas was accustomed to working independently and did not require any supervision. (Testimony of Jolly, Tr. at 1:58–59).

In October 1987, Astor approached the plaintiff and asked him whether he might be interested in moving over to the MDC Marketing Department. (Testimony of Jolly, Tr. at 1:59–60/Testimony of Astor, Tr. at 1:180–181). Stating that the MDC division needed somebody with Jolly's level of expertise in order to help get it established, he encouraged the plaintiff to accept his request. (Testimony of Jolly, Tr. at 1:59–60). Jolly then asked why he was passed over when he inquired about managing the department a month earlier.

Astor replied by stating that NTI had decided to make the position to which the plaintiff was referring into a senior executive level 14 position (which meant that the plaintiff would not be able to apply for it), but that this position was a different one. (Testimony of Jolly, Tr. at 1:59–60). In fact, John Demchuk, a candidate with virtually no prior MDC knowledge, and who had to be sent to product training classes, had already been awarded the MDC Marketing Manager position in July 1987.[9] (Testimony of Jolly, Tr. at 112/Testimony of Wallis, Tr. at 2:202–203).

Jolly next inquired into the character of the contemplated move, and Astor told him that it would be lateral, not promotional. The plaintiff then responded that he could not, in good conscience, consider a lateral move, in view of the totality of responsibility attendant to the new position; nonetheless, he asked for some time to contemplate the offer. (Testimony of Jolly, Tr. at 1:60). Later, Astor got back to him and informed him that he just had spoken with John Wallis, and that Wallis felt there would be a bright future in store for him if he put his expertise to work in the new MDC Marketing Department. (Testimony of Jolly, Tr. at 1:60–61/Testimony of Astor, Tr. at 1:181). Finally, in reliance on Astor's repeated assurances about the potential for promotion into management, Jolly accepted the new position. (Testimony of Jolly, Tr. at 1:61/Testimony of Astor, Tr. at 1:182).

In his new role in the MDC department, the plaintiff's responsibilities included answering technical inquiries about the product line, making product presentations, providing support to salespeople, implementing successful market development activities, and breaking in new product specialists. (Testimony of Jolly, Tr. at 1:61–62, 64). Demchuk, the new department super-

---

**8.** In an organizational chart produced in February 1988, Astor was depicted as the Manager of the Marketing Department. That department had four sub-departments, each headed by a different manager. Those sub-departments were listed as Contract Services, Product Support (or Technical Marketing), Market Analysis, and MDC Marketing. (Plaintiff's Exb. 33).

**9.** Demchuk was referred to the position by a friend who worked in a different NTI region. In an internal memorandum sent to the appropriate personnel, it was indicated that Demchuk, apparently desperate for a job, "indicated a willingness to consider any opportunities [NTI] might have." (Plaintiff's Exb. 50).

visor, soon found Jolly to be an excellent employee. In fact, in a Management Evaluation and Development ("MED") Review, dated March 22, 1988, Demchuk made the following comments about him:

"Fulfills most task assignments before target dates ... [,] has demonstrated excellent initiative in overcoming problems, obstacles, [etc.] Extremely effective speaker [and] presenter. [H]as shown great skill in product expertise and possesses excellent communication skills.

(Plaintiff's Exb. 13/Defendant's Exb. 19).

Armed with Demchuk's vote of confidence, Jolly again inquired about management possibilities, and Demchuk replied that, given his continuing professionalism and the opportunities opening in the region, he soon would be successful if he kept his eyes and ears open and jumped at every chance he had. Demchuk also pledged his unconditional support for Jolly's goals. (Testimony of Jolly, Tr. at 1:65–66/Deposition of Demchuk at 2:190).

Heeding Demchuk's advice, Jolly soon bid for the job of Regional Support Manager, a marketing position in Tarrytown, New York, involving work with the DMS–10 product, by submitting a TAP form in early March 1988. (Testimony of Jolly, Tr. at 1:66–67). He was originally directed to this job opportunity by the EEOC coordinator in the Eastern Region, and he applied for it after getting the go-ahead from Demchuk. (Testimony of Jolly, Tr. at 1:67–68).

Jim Caudle, NTI Director of Account Marketing, was the hiring manager for the position, so Jolly telephoned him to express his interest. (Testimony of Jolly, Tr. at 1:68/Testimony of Caudle, Tr. at 2:28). During that call, the plaintiff detailed his past experiences with both the DMS–100 and DMS–10 products, admitting that he worked predominantly with the former, and emphasized his extensive marketing background, a qualification that Caudle believed to be very important. (Testimony of Jolly, Tr. at 1:68–69). Jolly then sent a memorandum to both Astor and Demchuk explaining that he was applying for the Tarrytown position, that he felt he was qualified for

the job, and that the two of them probably would be receiving phone calls from Caudle in the next day or so, in connection with the application. (Testimony of Jolly, Tr. at 1:69–70/Plaintiff's Exb. 27).

Two months passed, and Jolly still had not received any response about the disposition of his application. Accordingly, he sought out Demchuk for an explanation, and Demchuk told him to be patient about the process. After another week or two passed, the plaintiff finally called Caudle. Caudle then explained that Astor called him shortly after the application was filed and told him that the plaintiff was not transferable out of the Eastern Region. When Jolly inquired as to why Astor took that action, Caudle referred him to his local personnel department. (Testimony of Jolly, Tr. at 1:70–72).

Following that lead, Jolly immediately consulted with two persons in the local Human Resources Department, Manager Pat Pape and Representative Margot Davis. He asked them why his application was rejected and why nobody bothered to tell him about it, but the two professed ignorance and referred him back to Astor and Demchuk. (Testimony of Jolly, Tr. at 72).

Accordingly, Jolly sought out Demchuk, recapitulated the entire story, and asked for an explanation. Demchuk also professed ignorance and suggested that he see Astor. The plaintiff did so, and Astor then told him that it was Demchuk's responsibility as his manager to explain what happened. Jolly went back to Demchuk. Demchuk continued to plead ignorance and sent him back to Astor. Again, Astor referred him back to Demchuk and, again, Demchuk sent him back to Astor. Finally, on his third visit, he succeeded in getting an answer from Astor. (Testimony of Jolly, Tr. at 1:72–73).

Astor told him that his application had not been processed because he had not been in his current position for more than a year and, thus, was ineligible for promotion

under the company's TAP policy.[10] (Testimony of Jolly, Tr. at 1:73–74/Testimony of Astor, Tr. at 1:186). He also stated that he thought that Jolly was too valuable an employee for the department to lose. (Testimony of Astor, Tr. at 1:186).

The plaintiff then responded by explaining that he was becomingly increasingly frustrated with the way his career at NTI was headed. He stated that every time that he wished to be considered for a position, Astor would come up with some reason as to why he should not have it, and that, despite his value to the company, he had been unable to advance in any way. (Testimony of Jolly, Tr. at 1:74).

At trial, the plaintiff described it in further detail the following way:

> I told [Astor] that I saw his position as one that was stifling to my professional growth, stifling to my career advancement opportunities, and that it was prevalent throughout his entire department ... [,] the fact that other people, other whites having less experience with the company, less product knowledge, were able to come in and be promoted over those of us who initiated the department, who got the department started. I told him that I couldn't understand that.
>
> *He, in turn, told me that if what I wanted were management opportunities, advancement goals that I wanted to reach, he told me that he recommended that I leave the company.*

(Testimony of Jolly, Tr. at 1:74) (Emphasis added).

This conversation came as a bit of a shock to Jolly because, hitherto, Astor had repeatedly remarked about his excellent work product, expertise, and value to the region, and encouraged him to keep pushing for advancement. (Testimony of Jolly, Tr. at 1:76). In fact, John Wallis, who sat higher than Astor in the NTI chain of command made similar remarks:

John Wallis told me that I was very highly regarded, not only within the region, but within the entire company, that my reputation and my skills had become noticed by a number of people in high ranking positions within the company, and that if I wanted to know how he valued my performance and me as a person, he told me that he viewed my performance as being very good, that I indeed was of tremendous value to departments in which I had worked, and that I would probably be moved on into managerial responsibilities.

(Testimony of Jolly, Tr. at 1:76–77).

Based both on his conversation with Astor (which he felt confirmed his suspicions that he was not going to grow professionally at NTI) and his frustration with seeing many employees who entered the department after he did eventually become higher-ups, he submitted a letter of resignation on July 11, 1988. (Testimony of Jolly, Tr. at 1:78–79/Defendant's Exb. 9). Then, after seeking out Astor and informing him that he, indeed, was "taking him up on his invitation," Astor simply shrugged his shoulders. To Jolly, it seemed as though Astor's only concern was with whether he planned to accept employment with a competing firm. (Testimony of Jolly, Tr. at 1:79).

Though Astor apparently seemed less than distressed about Jolly's departure, he continued to view him favorably as an employee: In a letter of recommendation that he drafted on August 12, 1988, he described Jolly as a "solid professional" who was "instrumental in establishing [NTI's] technical marketing [department]." (Plaintiff's Exb. 7). He further praised Jolly's "strong organizational and presentation skills" and his ability to communicate with customers "particularly effective[ly]" in

---

**10.** Although Jolly held the same position during the one year before he applied for the Tarrytown job, he had only been working in the MDC department for approximately five or six months. (Testimony of Jolly, Tr. at 121). Under the company's "one-year rule," employees are not eligible for promotion until they have served in their current position for at least one year. (Plaintiff's Exb. 14). As will be seen later, this rule was less than rigidly enforced, often broken, and generally ignored by the company when circumstances demanded that it not be complied with.

both written and oral form.[11] (Testimony of Astor, Tr. at 165).

## II.

NTI sought to install regional support managers in four cities, including Tarrytown, Denver, Chicago, and Birmingham, and Caudle was assigned to head the search. (Testimony of Caudle, Tr. at 2:30). Accordingly, job announcements were posted in each of the respective regions. (Testimony of Caudle, Tr. at 2:31).

Under the NTI TAP policy, an employee is only eligible to apply for a posted position if he "meets the minimum position specifications." (Plaintiff's Exb. 14 at ¶ 6.4.1). On the TAP form that was posted in the Northeast Region, the *minimum requirements* were listed as: "BS/BA preferably in marketing or engineering plus 8 years telephony experience and 2–5 years sales/marketing experience." (Plaintiff's Exb. 56). This particular position could be characterized as a marketing job because one of the key responsibilities of the manager was to educate customers through the use of presentations. (Testimony of Caudle, Tr. at 2:42).

Four white persons were ultimately hired to fill the four positions, and not one of them met the minimum requirements listed on the TAP form, although Jolly satisfied them all. (Testimony of Caudle, Tr. at 2:33).[12] Robert Lambregste was chosen to fill the Tarrytown position for which the plaintiff applied. (Testimony of Caudle, Tr. at 2:35). Lambregste had no college degree, no prior sales experience, and had worked in his previous job for less than one year.[13] (Testimony of Caudle, Tr. at 2:37–39/Defendant's Exb. 60). Moreover, he was hired by Caudle despite two "below average" evaluations which revealed that,

among other things, his work had been poor in quality, he required more supervisory direction than the average employee, and he only partially completed some of his assignments. (Testimony of Caudle, Tr. at 2:36–37). In fact, after he was hired, Caudle sent Lambregste to courses on sales training and team selling. (Testimony of Caudle, Tr. at 2:39–40).

In order to gauge the qualifiedness of the candidates, Caudle stated that he relied heavily on a Position Profile that he drafted for use in the application process. (Testimony of Caudle, Tr. at 2:53/Defendant's Exb. 30). Although the profile lists several prerequisites relating to education and experience, Caudle testified that he placed the most weight on knowledge of DMS–10 and understanding the telephony network because the new regional support manager would have to "hit the road running and start working with the customers in the field in order to have immediate product sales increases." (Testimony of Caudle, Tr. at 2:59).

Yet, the Position Profile that Caudle himself drafted listed, ahead of "Key Skills/Knowledge," a "Formal Education and Training" requirement that the candidate possess a college degree. (Defendant's Exb. 30). None of the managers ultimately selected satisfied this requirement, and Caudle explained that the additional words "or equivalent experience," had been inadvertently omitted in this case. (Testimony of Caudle, Tr. at 2:56).

Caudle stated that, shortly after he received Jolly's TAP form, he contacted John Wallis and inquired as to whether the plaintiff had prior DMS–10 experience, and then determined that he did not. Accordingly, he testified that he immediately sent the TAP form back to Human Resources "with

---

**11.** Jolly received a very similar recommendation from John Wallis, dated August 25, 1988. (Plaintiff's Exb. 8).

**12.** For example, the person hired in Chicago had no college degree, no sales experience, and no marketing experience. The person hired in Birmingham had never been in sales or marketing and had worked ten years for NTI on a job that only required him to transfer customer specifications onto a special form that could be

sent to a factory. (Testimony of Caudle, Tr. at 2:34–35).

**13.** At trial, Caudle could not be certain whether Lambregste had worked a full year in his prior position, although, at deposition, he testified that he had had a conversation with his supervisor to see whether he could be released notwithstanding the one-year rule. (*See* Testimony of Caudle, Tr. at 2:38–39).

a little note on it saying that [Jolly] wasn't qualified for the position." (Testimony of Caudle, Tr. at 2:63–64, 94).[14] Wallis told almost the same story, stating that he informed Caudle in a telephone call that he did not think Jolly had the requisite DMS–10 experience, although he thought that the plaintiff had done an excellent job overall and was highly regarded.[15] (Testimony of Wallis, Tr. at 2:191).

Interestingly enough, as Wallis remembered it, Caudle thanked him for his assistance and stated that he would be continuing to process Jolly's application along with the others. (Testimony of Wallis, Tr. at 2:206). As Caudle remembered it, he made no such comment to Wallis, rather, he merely rejected Jolly's application on the spot. (Testimony of Caudle, Tr. at 2:93).

Caudle claimed that he hired Lambregste because he "exceeded the five-year minimum for marketing experience and exceeded greatly the ten-year experience in telephony," and, furthermore, because he had been working in a DMS–10 division for four years and was intimately knowledgeable with the product. (Testimony of Caudle, Tr. at 2:70/Defendant's Exbs. 55, 57–60).[16] By the same token, he estimated that Jolly would have required at least four to eight weeks of DMS–10 training classes in order to be brought up to speed on the product line. (Testimony of Caudle, Tr. at 2:79–81).

### III.

Astor did not recall that Jolly expressed an interest in obtaining the Technical Marketing Manager position in June 1987.

(Testimony of Astor, Tr. at 1:165).[17] He did remember telling the plaintiff that he was looking for somebody with a "particularly strong" technical background, but he also insisted that part of the reason the plaintiff did not receive the job was because he did not apply. (Testimony of Astor, Tr. at 1:165, 166). Nevertheless, Astor further stated that, had Jolly been afforded an interview, he might have persuaded him that he was qualified for the position. (Testimony of Astor, Tr. at 1:168).

Astor awarded the Technical Marketing Manager position to John Donnelly because Donnelly had "sufficient technical skills for the position ..., demonstrated a considerable knowledge of networks and telephone company operations, and ... had several years of management experience." (Testimony of Astor, Tr. at 1:214) (Donnelly's resume is Defendant's Exb. 33). These qualifications, Astor determined, sufficiently offset his complete lack of DMS–100 knowledge. (Testimony of Astor, Tr. at 1:217).

Donnelly had previously been working on the marketing of a new NTI product, but NTI eventually withdrew the product from the Eastern Region, leaving him to seek a different position. (Testimony of Astor, Tr. at 1:215). Astor believed that, compared to his recently eliminated position, Donnelly's role as the Technical Marketing Manager represented, at best, a lateral move, if not a step downward. (Testimony of Astor, Tr. at 1:216).

14. The plaintiff, noting that EEOC regulations require employers to retain all documents relating to selection decisions for six months, requested this document during discovery, but the defendant failed to produce it. (Proffer of Plaintiff's Counsel, Tr. at 2:64). When questioned as to why NTI could not seem to find a piece of evidence going directly to the heart of the plaintiff's case, the defense attorney simply represented that it could not be located anywhere. (Proffer of Defendant's Counsel, Tr. at 2:64).

15. Wallis admitted to having another conversation with Caudle, after this suit commenced, in order to help straighten out his memory. (Testimony of Wallis, Tr. at 2:196, 205).

16. Caudle also testified at trial that, due to spending cuts within the company, funds for relocating employees were not available, insofar as this position was concerned. (Testimony of Caudle, Tr. at 2:77–78). In that regard, he further noted that the candidate he chose to manage the Atlanta office was located in Birmingham at the time, and that, instead of relocating him, he simply allowed him to operate from his existing location. (Testimony of Caudle, Tr. at 2:83).

17. Astor also denied ever telling Jolly that he would be the acting manager of the Technical Marketing Department. (Testimony of Astor, Tr. at 1:206).

Astor also denied that Jolly ever inquired about managing the MDC department. (Testimony of Astor, Tr. at 1:177, 220). In any event, he stated that John Wallis was the hiring manager at the time that Demchuk was awarded the position, and that he, Astor, played no role in the selection process. (Testimony of Astor, Tr. at 1:221–222). Likewise, Wallis also denied that Jolly ever made any inquiry into the possibility of obtaining the MDC Marketing Manager position. (Testimony of Wallis, Tr. at 2:189). Moreover, Wallis deemphasized the fact that Demchuk had no substantive MDC experience because, in his opinion, it was more important that he manage the group than have detailed product knowledge. (Testimony of Wallis, Tr. at 2:213).

With respect to the events surrounding Jolly's application for the Tarrytown position, Astor's memory suddenly grew hazy. He acknowledged that the handwritten phrase "John, let's discuss" (which appeared on the memorandum he received from the plaintiff) was his own, though he had no personal recollection of writing it. (Testimony of Astor, Tr. at 1:224). It will be recalled that this was the memorandum through which Jolly informed Astor and Demchuk that he was seeking their assistance in obtaining the newly opened managerial position. (*See* Plaintiff's Exb. 27).

Instead, Astor recalled that he first heard about the plaintiff's bid for the Tarrytown job from Human Resources Manager Patricia Pape, who alerted him that Jolly was concerned as to why he had not yet heard about the disposition of his application. (Testimony of Astor, Tr. at 1:224). He did not remember having any conversations about Jolly's pursuit of the position, and he further denied that he ever had any discussions with Jim Caudle about the processing of Jolly's application. (Testimony of Astor, Tr. at 1:225–226).

As Astor recalled it, he first got involved in the affair after hearing that Jolly needed help in attempting to determine precisely what had happened to his application. (Testimony of Jolly, Tr. at 1:226). He then sought explanations from Demchuk, Wallis, and Pape, the latter of whom, he claimed, reminded him of the company's one-year policy. (Testimony of Astor, Tr. at 1:226).[18] He did not call Caudle, however, and did not contact anybody in the Human Resources Department in the Northeast Region. (Testimony of Astor, Tr. at 1:227–228).

Demchuk's recollection of this episode painted a completely different picture. Demchuk not only remembered receiving the memorandum from Astor regarding a discussion about Jolly's application, but remembered personally discussing the matter with him, as well. (Deposition of Demchuk at 2:198). Demchuk recalled Astor asking him whether the plaintiff's departure would leave him shorthanded, to which he replied that it would certainly be a loss, though "nothing insurmountable."[19] (Deposition of Demchuk at 2:198). Then, as Demchuk recollected:

> Astor made mention of the fact that the company guidelines which exist [until] today state that you have to be in your specific job a period of no less than 12 calendar months before you can TAP and until that time I did not know that that regulation was in effect, but it is indeed a Human Resources regulation.

(Deposition of Demchuk at 2:198).

Astor stated that he eventually informed Jolly that he was not awarded the Tarrytown position because he had not been in his current position for more than one year and because he was too valuable to lose from the department. (Testimony of Astor, Tr. at 1:229). Yet, Astor also ac-

---

**18.** As noted earlier, the one-year rule was created to prevent NTI from having to endure an endless cycle of retraining new employees to replace those that were just promoted. (Testimony of Jean McCullough, Tr. at 2:142). Because relocating employees was often such an expensive option, the one-year rule was more frequently waived in instances where a compet-

ing candidate worked in a different region. (Testimony of McCullough, Tr. at 2:144–145).

**19.** In that vein, Demchuk denied that he ever refused Jolly permission to apply for the Tarrytown position. (Deposition of Demchuk at 1:74).

knowledged that, not long after Donnelly was named the Technical Marketing Manager, four of the product specialists in that department, including Mathews and Brick, were promoted. (Testimony of Astor, Tr. at 1:186–187). This, he admitted, caused some difficulty for Donnelly, whose 1988 MED review even noted that he had "had difficulty replacing lost talent. . . ." (Plaintiff's Exb. 47). In fact, it is interesting to note that, despite the alleged need for staffing within the MDC Department, after Jolly resigned from the company, nobody was hired to replace him. (Deposition of Demchuk at 2:125).

Astor further admitted that, regarding the one-year rule, other non-minority employees had received promotions without having been in their prior positions for more than one year, including Dennis Mathews, who was promoted to management before serving a full year as a product specialist. (Testimony of Astor, Tr. at 1:188).[20] In any event, Jolly's MED review for the period September 1987 through March 1988 indicated that he had been employed in his present position since December 1986. (Plaintiff's Exb. 13). Thus, even NTI's own documentation indicated that the one-year rule would not have been applicable to him.[21]

### IV.

Astor remembered the June 1988 conversation that he had with Jolly—the discussion in which Jolly alleged that Astor recommended employment with another company if what he sought was a managerial position. Astor described it the following way:

It seemed to me that Mr. Jolly was having a career crisis. He was primarily focused on getting promotions. He had had, by [NTI] standards, . . . a fairly good record of promotions. In fact, it was quite good. But he was frustrated. It seemed to me that he was focusing far more of his concern on the actual promotions and not on what he wanted to do with his career.

Generally, when you are trying to pursue a career and move ahead in a career, you have some particular focus in mind, and it didn't seem that he had that. But what I wanted him to do was to expand his thinking on it, and I offered to help him to do that. I said, you really have got to think about what you want to do.

\* \* \* \* \* \*

What I told him is that he needs to think about what he wants to do in much broader terms, not just in terms of the next promotion in this department or some other department. What do you want to do? Think the whole thing through. It may mean moving to another department or another area, another company, whatever. . . .

(Testimony of Astor, Tr. at 1:232, 233).

Astor stated that this was the last time he discussed the matter with the plaintiff until he received his letter of resignation on July 11, 1988. (Testimony of Astor, Tr. at 1:235). He recalled being "a little surprised" by the resignation but "figured [Jolly] had developed his [career] plan, and his plan included some other company than ours." (Testimony of Astor, Tr. at 1:236).

### V.

It will also be recalled that Demchuk and Astor bounced Jolly back and forth three times, each professing ignorance as to why his application was not processed. At trial, however, Kathleen Ferris, a former NTI employee who worked in the Eastern Region's Human Resources Department at the time of the disputed events, provided yet another version of the entire affair.

---

**20.** Incidentally, Mathews, who supervised 13 or 14 employees in his managerial role, had *no college education or direct supervisory experience.* (Testimony of Astor, Tr. at 1:163/Testimony of Wallis, Tr. at 2:210). Moreover, Patricia Pape was also promoted to management, despite having *no prior management experience.* (Testimony of Wallis, Tr. at 2:210).

At his deposition, Wallis was asked why there were no black managers appointed as the East-

ern Region was starting up, and he replied that, "[i]n order to get things going, we had to go with people who were experienced in the functions. . . ." (Testimony of Wallis, Tr. at 2:211).

**21.** Not surprisingly, Astor testified that he considered the date information on the plaintiff's MED form to be incorrect. (Testimony of Astor, Tr. at 1:245).

Ferris stated that Human Resources was contacted by somebody in the Northeast Region who wanted to set up an interview for Jolly. (Testimony of Ferris, Tr. at 1:248–249). She then approached Demchuk and asked him if he would release him for the job, but Demchuk replied that he would not. (Testimony of Ferris, Tr. at 1:249). She then asked him if he cared to offer an explanation, but he refused to do so. (Testimony of Ferris, Tr. at 1:249). In her two years with NTI, Ferris had never been confronted with the situation of a manager refusing to release an employee for an interview. (Testimony of Ferris, Tr. at 1:250).

On the other hand, Mary Ellen Colontonio, currently the Senior Human Resource Representative in NTI's Tarrytown office, testified that she was the person who set up interviews for the regional manager position. (Testimony of Colontonio, Tr. at 2:217–219). Colontonio did not recall contacting the Eastern Region in an effort to set up any interviews with Jolly in connection with the application process. (Testimony of Colontonio, Tr. at 2:219–220). Margot Davis, Senior Human Resources Representative in the McLean office for the preceding five years, also testified that she had no recollection of being contacted by anybody in the Tarrytown office regarding the releasing of Jolly for an interview. (Testimony of Davis, Tr. at 2:226–228).

In a letter to the Washington-area EEOC office, dated September 13, 1988, the Director of NTI Employee Relations, James Rodky, wrote that an internal investigation into Jolly's claim revealed that he was not promoted because he had not been in his current position for more than one year and, additionally, because he lacked DMS–

10 experience. (Plaintiff's Exb. 72).[22] Moreover, in an answer to the Plaintiff's First Set of Interrogatories, submitted in December 1990, the defendant indicated that Jolly was not selected for the Tarrytown position because:

> [p]laintiff had not been in his current position for at least one year. In addition, Mr. Jolly was one of only two Product Specialists in the MDC Marketing Department in the Eastern Region. Finally, Plaintiff was not as qualified for the position as Mr. Lambregste.

(Plaintiff's Exhibit 30).[23] Furthermore, at trial, Jean McCullough, full-time Director of Human Resources in NTI's Eastern Region since October 1988, admitted that decision-making with respect to the one-year rule would logically have been the province of Astor or Demchuk.[24] (Testimony of McCullough, Tr. at 2:98, 122).

McCullough, assisted by an NTI document governing TAP procedures, acknowledged the existence of the following three rules: (1) If a manager wishes to promote an employee from within his department, he need not post the position, (2) conversely, if he decides not to fill a vacancy from within the department, he *must* post the position, and (3) insofar as the one-year rule is concerned, reassignments[25] initiated by the company do not affect eligibility for further promotion. (Testimony of McCullough, Tr. at 2:100–101/Plaintiff's Exb. 14). Interestingly enough, McCullough testified that Jolly's first transfer from Research Triangle Park to the Eastern Region constituted an exception to the one-year rule. (Testimony of McCullough, Tr. at 2:145).

## VI.

■ In a Title VII case, the plaintiff has the initial burden of proving, by a

---

**22.** As an aside, Rodky also mailed a letter to the Fairfax County Human Rights Commission in which he incorrectly indicated that Jeannie Swanson, not Robert Lambregste, was awarded the Tarrytown position. (Plaintiff's Exhibit 74).

**23.** In subsequently filed Supplemental Answers, NTI further indicated that Jolly was not offered the Tarrytown position because "the hiring manager considered budget constraints and relocation expenses in making his decision." (Plaintiff's Exbs. 31, 32).

**24.** McCullough formerly worked in an NTI office in Raleigh, but was later relocated to McLean at the company's expense. (Testimony of McCullough, Tr. at 2:104).

**25.** McCullough later testified that "reassignments" typically occur in instances where employees encounter personality differences with their managers and are transferred to other departments, or in instances where certain job positions are eliminated. (Testimony of McCullough, Tr. at 2:140–141).

preponderance of the evidence, a *prima facie* case of discrimination. If he succeeds in so doing, then the burden shifts back to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Should the defendant carry this burden, then the plaintiff ultimately must prove, by a preponderance of the evidence, that the defendant's reasons were not true reasons, but, instead, a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

■ To make out a *prima facie* case of discrimination, Jolly is required to show that he applied for a position for which he was qualified, that he was rejected, and that, after the rejection, NTI either continued to seek applicants or filled the position with a white employee. *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989); *Mallory v. Booth Refrigeration Supply Co., Inc.*, 882 F.2d 908, 910, n. 1 (4th Cir.1989).

■ Moreover, NTI cannot succeed in rebutting Jolly's *prima facie* case by articulating after-the-fact hypothetical nondiscriminatory reasons for its actions. Instead, it must explain its motives as of the time that the plaintiff was actually rejected. *Norris v. City and County of San Francisco*, 900 F.2d 1326, 1331 (9th Cir. 1990); *Cuddy v. Carmen*, 762 F.2d 119, 127 (D.C.Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985), *reh'g denied*, 475 U.S. 1072, 106 S.Ct. 1389, 89 L.Ed.2d 613 (1986). Accordingly, in determining whether NTI's proffered reasons are pretextual, the court must "weigh and resolve not only what information was known to [it] at the time, but also the plausibility of its explanations in light of all the evidence and the inconsistency of these explanations over time." *Norris*, 900 F.2d at 1331.

In the end, however, Jolly still retains the burden of proving that he was not promoted "under conditions which, more likely than not, were based upon impermissible racial considerations." *Gairola v. Commonwealth of Virginia Dep't of General Services*, 753 F.2d 1281, 1286 (4th Cir. 1985), *quoting, Young v. Lehman*, 748 F.2d 194, 196 (4th Cir.), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 489 (1985).

■ Earlier in this case, this court held that Jolly could not base his action for employment discrimination on the first two instances where NTI failed to promote him, because those claims were time barred. Nevertheless, prior discriminatory acts which were not made the basis for a timely charge may constitute relevant background evidence in a proceeding brought to redress a subsequent injury. *United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Holsey v. Armour & Co.*, 743 F.2d 199, 207 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985).

■ Jolly made out a *prima facie* case of discrimination with little trouble. Pursuant to NTI's own written requirements, an employee could only apply for a posted position if he met the minimum stated requirements. Although the plaintiff fully satisfied the minimum requirements for the Tarrytown position, the person ultimately selected, Robert Lambregste, did not. Jolly possessed a college degree, close to eight years of experience in the communications field, and many years of sales and marketing experience. Lambregste had no college degree, no sales experience, and a less than spectacular history of MED reviews. In fact, the evidence demonstrated that *every one* of the applicants eventually selected for the other regional management positions failed to meet even the minimum stated requirements.

■ As expected, the burden shifted to NTI to articulate a legitimate, nondiscriminatory reason for its decision not to promote Jolly to the Regional Manager position. Although the defendant then offered a multiplicity of reasons to justify its action, the plaintiff had little trouble proving

that none of these explanations was worthy of any credence. To be sure, Jolly did not have too onerous a task, as the defendant's various personnel told so many stories, so totally inconsistent with each other, that they had lost all credibility by the conclusion of the proceedings. Put simply, NTI took more positions than a gymnast on a trampoline.

Whereas the court found those witnesses still employed at NTI to be wholly unworthy of belief, it also found the plaintiff's testimony to be extremely credible. In all material respects, then, the court has accepted as true Jolly's version of any contested events.

The defendant first argued that Jolly was not promoted because he had not been in his previous position for more than one year. Yet, Jolly's MED review for the period September 1987 through March 1988 clearly indicated that he had been working in his current position for more than one year. This is hardly surprising, given that his most recent transfer had been lateral in nature.

In any event, the evidence further indicated that the one-year rule was simply a dormant creature that NTI awakened only when it was convenient to do so. It appeared as though the rule could be waived for any or no reason whenever the appropriate personnel agreed to waive it. In fact, although Caudle's memory became faulty at trial, it appeared that he acknowledged at deposition that even Lambregste had not worked in his previous position for at least one year prior to being selected for the Tarrytown position. Moreover, the evidence established that other non-minorities in the Eastern Region, such as Dennis Mathews, had been promoted to management without having satisfied the one-year rule. Thus, it was clearly established at trial that the one-year rule was anything but absolute and that its invocation in Jolly's case was nothing more than pretext for other impermissible considerations.

NTI also asserted that Jolly was not released for the Tarrytown position because he was too valuable to lose from the department. Strangely enough, however, the hassles of replacing lost talent never plagued the Eastern Region until Jolly's case came along. It will be recalled that Donnelly experienced some difficulty when he first became the Technical Marketing Manager because many of the product specialists in his department were promoted shortly after he began. Moreover, Demchuk admitted at deposition that he told Astor that Jolly's loss would not be an insurmountable problem.

The evidence adduced at trial indicated to a near certainty that NTI's "too valuable to lose" alibi was a justification tailored exclusively for Edward Jolly. As Human Resources representative Kathleen Ferris pointed out during the proceedings, never in her two years at NTI had she witnessed an instance where a manager refused to release an employee for an interview. Accordingly, the court rejects this proffered explanation from NTI as unworthy of belief.

As a third excuse, the defendant introduced evidence to show that Jolly was not offered the Regional Manager position because he lacked DMS–10 experience and, as Caudle testified, DMS–10 experience was a necessity for a new product manager who would be forced to "hit the road running." In his first attempt at promotion to management, Jolly expressed an interest in being considered for NTI's Technical Marketing Manager position in the Eastern Region. Astor eventually awarded the job to John Donnelly, however, even though Donnelly had no significant product knowledge at the time. He had never made a single product presentation involving the DMS–100 product line, and his later evaluations indicated a weakness in the area of product knowledge. Jolly was undoubtedly better qualified to educate both his customers and his staff on the ins and outs of DMS–100. Apparently, however, product knowledge was not an important asset for a department manager.

In his second bid for management, Jolly inquired about the prospects of becoming the MDC Marketing Manager. As John Wallis testified, Jolly was as well-versed in DMS–100 and MDC as anyone he knew. Again, however, Astor shunted him away from formally applying, and the position

was later awarded to John Demchuk. Demchuk, who had been referred by a friend, appeared desperate for any job that NTI might offer and, like Donnelly, had no substantive product knowledge. Yet again, as Wallis testified, it was more important that Demchuk manage the group than have detailed product knowledge.

Finally, Jolly applied for the position in Tarrytown. It was undisputed that he met the minimum requirements for the role. Objectively, the evidence was overwhelming that the plaintiff was far more qualified for the job than others awarded the same position in other regions. It was also clear that Jolly had acquired a basic working knowledge of DMS–10 and had attended customer presentations for the same. Although Robert Lambregste may have had a stronger background in that particular product line, the TAP posting to which Jolly responded did not place a premium on DMS–10 proficiency.

NTI then stated that Jolly did not receive the Tarrytown position due to a purported lack of DMS–10 experience. Clearly, NTI has sought to have it both ways: It denied him two promotional opportunities by claiming that his superior product knowledge was irrelevant to the managerial equation, then denied him a third promotional opportunity on the grounds that managers must have superior product knowledge. Put another way, whatever qualifications the plaintiff had, NTI managed to find that those qualifications were irrelevant, even if it meant having to take totally inconsistent positions in extremely similar factual contexts.

Finally, the defendant contends that Jolly was not awarded the Regional Manager position because there were no relocation funds available to move him from the Eastern Region to the Northeast Region. This excuse is plainly absurd. Caudle proffered this explanation during the trial, even though it could not be reconciled with the rest of the story that he told.

Caudle testified that, shortly after he received Jolly's application, he called Wallis to inquire as to whether he had any DMS–10 experience. When told that he didn't, Caudle stated that he immediately sent the application back to the Eastern Region with a note on it stating that the plaintiff was not qualified. If this were true, then lack of relocation funds could not have been the reason for Jolly's non-promotion. As a matter of logic, Caudle either had the funds to transfer Jolly or he did not. If there were no funds available, then the matter would have been ended right there and no phone call to Wallis would have been necessary. By the same token, if Jolly's application even merited a call to Wallis, then lack of relocation expenses was not the reason the application was rejected. Again, the court found this to be another utterly meritless *post hoc* excuse that tended to show, if anything, that NTI was throwing out any explanation that it could and hoping that one would eventually stick. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989) ("The critical inquiry . . . is whether [race] was a factor in the employment decision *at the moment it was made.*") (Emphasis in original).

NTI witnesses making explanations to reconcile physical evidence, or the lack thereof, with the stories that they told in court became a recurring theme throughout the trial. For example, in order to explain how persons chosen as Regional Managers were able to meet even the minimum posted qualifications when they did not have college degrees, Caudle testified that, by simple error, the phrase "or equivalent experience" was inadvertently left off the TAP form. Caudle also stated that, after hearing that Jolly had no DMS–10 experience, he immediately rejected his application and returned it to the McLean office with an appropriate note attached. Yet, despite EEOC regulations forbidding the destruction of certain employment records, nobody in the region could seem to locate the document.

The most troubling aspect of the defendant's case, however, was the multitude of conflicting stories told by its witnesses. Demchuk claimed that, after receiving Astor's memorandum regarding Jolly, the two discussed the matter. He testified that he told Astor that Jolly's departure would not create an "insurmountable"

problem, but that Astor reminded him of the one-year rule. Astor, on the other hand, had no recollection of that conversation with Demchuk, let alone of writing the note asking him to discuss the matter. In fact, Astor recalled first getting involved in the situation after Jolly was informed that he had been rejected. He also remembered that Patricia Pape reminded him of the one-year rule, a fact directly contradicted by Demchuk's story that Astor was the one who mentioned the rule in their conversation about releasing Jolly. In any event, Jolly testified that Caudle informed him that Astor refused to release him for an interview. This further demonstrates that Astor had direct involvement in the non-processing of the application.

This overwhelming dispute of fact goes directly to the heart of the case. Astor and Demchuk bounced Jolly back and forth several times and then professed ignorance as to the disposition of his application. The court entertains no doubt that these two knew full well all along what actually transpired. Apparently, the realization that they had unfairly deprived him of a well-deserved promotional opportunity was what led them to be less than forthcoming about what happened and unable to admit to him, face-to-face, what they had done.

Moreover, Caudle testified that, as soon as he determined that the plaintiff had no DMS–10 experience, he rejected his application outright. Wallis, however, stated that Caudle told him that he would be continuing to process the TAP applications. This comports with the testimony of Kathleen Ferris, who remembered that somebody called from the Northeast Region to schedule an interview with Jolly. According to Ferris, it was Demchuk who adamantly refused to release Jolly.

It was clear that from all this that Caudle attempted to hinge the entire case on his own actions and show that the process by which Jolly was rejected was extremely simple and totally neutral. (If this were so, then NTI would never have had to reach the one-year rule at all). It was equally clear, however, that the Eastern Region was the actual source of the rejection and that Jolly was denied the promotion on racial grounds.

As the Court noted in *United States Postal Service v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983), "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." The ultimate question in this case, as in most, was simply whether NTI's witnesses were worthy of credence. Here, the court finds that they were not. No two NTI employees told stories wholly consistent with each other.

In sum, the evidence at trial indicated that NTI was more than happy to classify Jolly as a manager in its own affirmative action records, but less than thrilled about actually making him a manager when the time came. As competent an employee as Jolly was, it is clear that he had reached his zenith at NTI as a senior product specialist and could not hope to achieve anything more.

## VII.

In order to prevail on a claim of constructive discharge, an employee must prove that his employer deliberately made working conditions intolerable and thereby forced him to quit. *EEOC v. Service News Co.,* 898 F.2d 958, 962, n. 1 (4th Cir.1990); *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986); *Holsey,* 743 F.2d at 209. Furthermore, the employee must show that his employer's actions were specifically intended as an effort to force him to quit. *Bristow,* 770 F.2d at 1255; *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 672 (4th Cir.1983), *rev'd on other grounds, sub. nom. Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). In addition, the intolerability of working conditions is "assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." *Bristow,* 770 F.2d at 1255. Thus, an employee may not be unreasonably sensitive to his working environment. *Id.*

In view of the foregoing legal standards, it is clear that Jolly was not con-

structively discharged from NTI. It is true that he was thrice passed over for promotional opportunities that he should have received, and it is also true that Astor dropped him an unmistakable hint that he would not be promoted to NTI management in the foreseeable future. The sum total of these events undoubtedly increased Jolly's anger and frustration. Indeed, they would have angered and frustrated any reasonable person in Jolly's position. It cannot be said, however, that they rendered working conditions objectively intolerable, even though Jolly himself may have found that he could no longer stand it. Moreover, even though Astor strongly insinuated that Jolly's future in management at NTI was a virtual nullity, there was no proof that, by a preponderance of the evidence, he specifically intended to force him to quit. In fact, it appeared that Astor, Demchuk, and Wallis prized Jolly's diligence and knowledge and viewed his departure as a decided loss to the company. In short, it might be said that these Eastern Region managers wanted to have their cake and eat it too: They preferred to have Jolly as a product specialist than as a manager and also preferred to have him as a product specialist than not to have him at all.

Unfortunately for NTI, Jolly was not content to have his career sit in limbo, so he chose to resign and move elsewhere. Accordingly, it cannot be said that NTI specifically intended to force Jolly out the door and, therefore, deliberately made his working conditions intolerable. Jolly was not constructively discharged by the defendant.

## VIII.

### Conclusions of Law

1. That the court has jurisdiction to decide this case, pursuant to 42 U.S.C. § 2000e–16.

2. That Plaintiff Edward L. Jolly has proven by a preponderance of the evidence that Defendant NTI discriminated against him on the basis of race when it denied him a promotion to the position of Regional Support Manager.

3. That Plaintiff Edward L. Jolly has failed to prove that he was constructively discharged by Defendant NTI.

Accordingly, Judgment is hereby entered in favor of the Plaintiff, Edward L. Jolly, on the claim for race discrimination and entered in favor of Defendant Northern Telecom, Inc., on the claim for constructive discharge. The parties shall be placed on a briefing schedule respecting the issues of remedies, attorneys' fees, and costs.